**Cynthia D. MURPHY, Appellant,**

v.

**Karl M.E. OKEKE, Appellee.**

**No. 04–FM–579.**

District of Columbia Court of Appeals.

Submitted Jan. 16, 2007.

Decided July 3, 2008.

---

**34.** *Id.* at 23.

**35.** *(Michael) Thomas,* 914 A.2d at 23.

**36.** *Id.*

**37.** *See Comford v. United States,* 947 A.2d 1181, 1189 (D.C.2008).

Clifton S. Elgarten, Justin P. Murphy, Brinkley Tappan, and Nathaniel Grow, Washington, DC, were on the brief for appellant.

Karl M.E. Okeke filed a brief pro se.

Joan S. Meier, Fernando R. Laguarda, Kathryn E. Walsh, and Michael T. Haas, Washington, DC, filed a brief on behalf of appellant as amicus curiae.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and FERREN, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

 At issue in this appeal is whether "cross (or mutual)" civil protection orders were properly entered against Karl M.E.

Okeke and Cynthia D. Murphy when Mr. Okeke physically assaulted Ms. Murphy after asking her to leave his apartment. Ms. Murphy challenges the entry of a Civil Protection Order ("CPO") against her for failing to leave her ex-boyfriend, Mr. Okeke's, apartment after he invited her there. Specifically, she alleges that (1) the CPO against her was improper as a matter of law because unlawful entry is a crime against property, not against a person and, therefore, does not satisfy the statutory requirement for an intrafamily offense; [1] (2) under the facts of this case, the CPO against her was improper because Mr. Okeke was the aggressor and violently assaulted her; [2] and (3) the trial court abused its discretion by denying her request for counsel fees.

We conclude that unlawful entry is also an "offense upon a person" because such statutes are designed to protect public safety as well as property. Thus, a finding of unlawful entry can serve as the basis for the entry of a CPO. However, the finding of an intrafamily offense, particularly

---

1. D.C.Code. § 16–1001(5)(B) (2001) provides that "[t]he term intrafamily offense means an act punishable as a criminal offense committed by an offender *upon a person* ... with whom the offender maintains or maintained a *romantic relationship*." (Emphasis added).

2. Ms. Murphy also challenges the CPO against her on procedural grounds, which we conclude lack merit. Contrary to Ms. Murphy's contentions, the trial court did not abuse its discretion by *sua sponte* raising and allowing Mr. Okeke to proceed on a theory of unlawful entry, which was not originally raised in his petition for a CPO. The Intrafamily Offense Act provides that "[t]he [CPO] petition may be amended or supplemented at any time prior to the conclusion of the hearing on the merits." Super. Ct. Dom. Vio. R. 2(b); *Johnson v. Fairfax Village Condo. IV,* 641 A.2d 495, 501 (D.C.1994); *see also Moore v. Moore,* 391 A.2d 762, 768 (D.C.1978) (holding that permission to amend pleadings, under Super. Ct. Dom. Rel. R. 15(b), is within

the purview of the trial court's discretion so long as the opposing party is assured fair notice and the opportunity to litigate). We discern no prejudice here, where the record indicates that the parties discussed the unlawful entry allegation at an earlier hearing. Furthermore, Ms. Murphy's concession that she was prepared to proceed rebuts the notion of prejudice.

Nor do we find persuasive Ms. Murphy's additional procedural argument that the trial judge abused his discretion by taking judicial notice of factual findings from Mr. Okeke's criminal simple assault trial—which the same judge presided over. "[A]s a general rule, courts will not judicially notice records and facts in one proceeding in deciding another proceeding," but there are exceptions and in appropriate cases where the same parties and subject matter are involved, a judge may take judicial notice of court records in related proceedings. *S.S. v. D.M.,* 597 A.2d 870, 880 (D.C.1991) (citation omitted).

where, as here, the parties are seeking mutual CPO's, does not automatically mean the trial court should enter a CPO against an offender. Rather, the trial court, in the exercise of its discretion, should only enter a CPO against a party for reasons consistent with the underlying purpose of the Intrafamily Offense Act.[3] In this case, Mr. Okeke violently assaulted Ms. Murphy, and the CPO was entered against Ms. Murphy for an improper reason—i.e., in the words of the trial judge, her "[own] behavior brought a lot of this on her." We are therefore constrained to reverse the trial court's entry of the CPO against Ms. Murphy and remand to the trial court with direction to vacate the CPO against her.

We also remand for the trial court to reconsider Ms. Murphy's request for counsel fees, in light of our reversal of the CPO against her, to determine whether counsel fees may be appropriate at this juncture.

## I. Factual Background

In April 2003, Ms. Murphy and Mr. Okeke began a romantic relationship. They started to have trouble in their relationship a few weeks prior to July 4, 2003. On July 4, 2003, Mr. Okeke invited Ms. Murphy to attend a Fourth of July party at his apartment. Both Ms. Murphy and Mr. Okeke consumed alcohol at the party. At some point in the evening, Ms. Murphy and Katy Elizabeth Gaire, Mr. Okeke's roommate, went into the bathroom to talk privately. When Ms. Murphy told Ms. Gaire that she and Mr. Okeke were involved in a romantic relationship, Ms. Gaire said, "now that I know that, you need to know that within the past two weeks since I've moved in ... I've slept with [Mr. Okeke] four or five times." After receiving this news, Ms. Murphy be-

came very emotional and began to cry and yell. Mr. Okeke then burst through the bathroom door and began arguing with Ms. Murphy and told her three or four times to "Get the F[expletive] out of his house." Ms. Murphy was sitting on the edge of the bathtub when Mr. Okeke lunged at her, and she fell into the tub. During the argument, Ms. Murphy ran into Mr. Okeke's bedroom. Inside the bedroom, Mr. Okeke dragged Ms. Murphy by her legs and arms; repeatedly hit her in the face (including her eye); kicked her in her legs and on her buttocks; and pushed her up against the wall. While he was assaulting her, Mr. Okeke repeatedly asked her to leave.

The attack left Ms. Murphy with a black eye, a swollen face, bruises extending from her lip down to the base of her neck as well as on the side of her face and arms, and cuts to the inside of her mouth.[4] After Mr. Okeke left the bedroom, Ms. Murphy locked the door and called 911. Before the police arrived, Ms. Murphy climbed through the bedroom window to the outside ledge of Mr. Okeke's first-floor apartment because she feared that Mr. Okeke would continue to assault her. Mr. Okeke walked to a nearby balcony, and the argument continued outside. A crowd started to form, and a neighbor helped Ms. Murphy off the ledge of the apartment to the street level.

After observing the argument and the behavior of Mr. Okeke and Ms. Murphy and speaking with both, a police officer determined that Ms. Murphy appeared to be "suicidal" and transported her to a psychiatric emergency room. The same day as her release, Ms. Murphy went to the George Washington University Hospital for treatment for her injuries.

---

3. D.C.Code §§ 16–1000 *et seq.*

4. Ms. Murphy's injuries also caused her to miss work.

On July 7, 2003, Ms. Murphy filed for a CPO against Mr. Okeke. A Temporary Protection Order was entered against Mr. Okeke, and a hearing was scheduled for July 18, 2003. Mr. Okeke filed a cross-petition for a CPO against Ms. Murphy on July 15, 2003, after learning of Ms. Murphy's CPO petition against him. He claimed that on July 4, 2003, she had "physical[ly] and verbally assaulted me. Then she proceeded to destroy/smash my computer and other property...."[5]

After several continuances, the CPO hearing was scheduled to commence after Mr. Okeke's December 10, 2003, sentencing hearing for his related criminal simple assault matter. On December 10, 2003, following a misdemeanor bench trial, Mr. Okeke was sentenced to 180 days in jail for the July 4, 2003, assault against Ms. Murphy. The jail time was suspended, and Mr. Okeke was placed on one year of probation, with an order to stay away from Ms. Murphy, complete fifty hours of community service, participate in a domestic violence counseling program, and make a contribution to the Crime Victim's Compensation Fund.

The CPO hearing commenced on January 30, 2004. At the conclusion of the CPO hearing, the trial judge announced his findings and indicated that in reaching his decision to enter mutual CPO's against Ms. Murphy and Mr. Okeke he found, *inter alia*, that on July 4, 2003, Ms. Murphy's initial refusal to leave Mr. Okeke's apartment, after he asked her to, constituted an unlawful entry. Based on this finding, the trial court determined that Ms. Murphy committed an offense "upon a person" in violation of the Intrafamily Offense Act.

The trial judge also found Ms. Murphy to be in criminal contempt for violating the Temporary Protection Order that had previously been entered against her, when she, on the evening of October 25, 2003, and into the early morning hours of October 26th, made repeated and threatening phone calls to Mr. Okeke. Ms. Murphy was sentenced for the criminal contempt charge to a thirty-day suspended sentence, one year of supervised probation, and mandatory alcohol and anger-management counseling. Lastly, the trial judge declined to award Ms. Murphy the counsel fees she requested. Ms. Murphy now appeals the issuance of the CPO against her, the criminal contempt conviction, and the court's denial of her request for counsel fees.

## II. Analysis

### A. Unlawful entry is an offense "upon a person" as well as an offense against property.

▮▮▮▮ Ms. Murphy's first contention is that the CPO was substantively improper because unlawful entry is not an offense "upon a person," as required by the Intrafamily Offense Act,[6] but is instead an offense solely against property. The trial judge rejected Ms. Murphy's argument and concluded that unlawful entry is an offense against the person and can form the basis for entry of a CPO:

> It is in essence committed upon a person because it requires an interaction of people and it has the aspects of it, though it doesn't necessarily include physical violence [it] is so often connected with physical violence. And it is a charge that is routinely the basis of charges,

5. As discussed, *see supra* note 2, the trial court allowed Mr. Okeke to proceed on a theory of unlawful entry. The court did not make a finding of fact regarding Mr. Okeke's

allegations against Ms. Murphy for assault or destruction of property.

6. *See supra* note 1.

convictions in domestic violence cases in the District of Columbia and also the basis for the issuance of protective orders through a temporary or protective order. And I'm of a view that it is subsumed in the nature of the offenses. . . . [T]here is an aspect of potential violence that is exactly what the intra-family type statutes are designed to address. . . .

"[T]he construction of a statute raises a 'clear question of law,' and we review the trial court's ruling *de novo." Jackson v. United States,* 819 A.2d 963, 965 (D.C. 2003) (quoting *Ashton Gen. P'ship v. Federal Data Corp.,* 682 A.2d 629, 632 (D.C. 1996) (other citation omitted)). We agree with the trial judge that the offense of unlawful entry can be categorized as an offense "upon a person" under the Intrafamily Offense Act and, therefore, in some instances can serve as the basis for entry of a CPO.[7] D.C.Code. § 16–1001(5)(B) states that "[t]he term intrafamily offense means an act punishable as a criminal offense committed by an offender *upon a person* . . . with whom the offender maintains or maintained a romantic relationship." (Emphasis added).

It would be inconsistent with the Intrafamily Offense Act's purpose to set forth a rule in this case that precludes, in all cases of unlawful entry, a domestic violence complainant from obtaining a protective order against an offender with whom the complainant maintains or maintained a romantic relationship. It is not difficult to imagine such a scenario, or similar situations, escalating into actual violence being committed by the trespasser against the occupant. Unlawful entry statutes are designed, in part, to prevent such escalations of violence by criminalizing conduct that is likely to lead to violence. The Intrafamily Offense Act is designed not just to protect against actual intrafamily violence, but also against the threat of such violence. *See Richardson v. Easterling,* 878 A.2d 1212, 1217 n. 6 (D.C.2005) (noting that the primary goal of the Intrafamily Offense Act was to protect victims of family abuse from acts and threats of violence); *Cruz–Foster v. Foster,* 597 A.2d 927, 929 (D.C.1991) (same).

While unlawful entry statutes are designed in part to protect property rights, we reject Ms. Murphy's contention that this function precludes the additional purpose of the statute—protecting a person against violence or threats of violence. To the contrary, unlawful entry statutes (also termed "trespass" statutes) are also directed at the protection of public safety and the prevention of violence against a person who is the victim of the unlawful entry. *See* Wayne R. LaFave, *Substantive Criminal Law* § 21.2 at 224 (2d ed. 2003) ("[T]he modern [trespass] statutes serve a

7. Other states have used different, though not dissimilar, formulations. For example, Delaware, New Jersey, New Mexico, and Washington specifically list offenses that constitute domestic violence or domestic abuse. The common thread is that these states that take a narrower approach list trespass as a punishable offense of domestic violence. *See* Del. Code Ann. tit. 10 § 1041 (2007) (abuse includes "trespassing on or in property of another person, or on or in property from which the trespasser has been excluded by the court order"); N.J. Stat. Ann. § 2C:25–19 (2007) ("domestic violence means the occurrence of one or more of the following acts [criminal trespass is included in the list of acts] inflicted *upon a person* protected under this act by an adult or an emancipated minor"); N.M. Stat. Ann. § 40–13–2 (2007) ("domestic abuse means any incident by a household member against another household member resulting in . . . ," *inter alia,* criminal trespass); Wash. Rev.Code § 10.99.020 (2007) ("domestic violence includes but is not limited to any of the following crimes when committed by one family or household member against another" with a list that includes criminal trespass in the first and second degree).

purpose much like that underlying the common law offense; just as the criminal sanctions of the common law [offense] were imposed for the protection of public safety, so too trespass statutes ... are directed at the prevention of violence or threats of violence."). The purpose of unlawful entry statutes in preventing violence or threats of violence against a person was recognized at common law, and this function of criminalizing unlawful entry has been adopted in contemporary case law in a number of states. *See, e.g., State v. Tullo*, 366 A.2d 843, 847 (Me.1976) (noting, at common law, criminal sanctions were imposed for trespassing to protect the public safety rather than to protect property rights); *Taggart v. Weinacker's, Inc.*, 283 Ala. 171, 214 So.2d 913, 923 (1968) (noting that trespass can be the potential cause of violence); *People v. Goduto*, 21 Ill.2d 605, 174 N.E.2d 385, 387 (1961) (recognizing that trespass can lead to violence and criminal sanctions are appropriate to protect the public).[8]

■ Based on this understanding of the history and purpose of unlawful entry statutes to protect against violence or threats of violence against the person, in addition to protecting property rights, we conclude that an unlawful entry offense can, in some circumstances, support the entry of a CPO under the Intrafamily Offense Act. "[T]he broad remedial purpose of the Intrafamily Offense Act ... is to protect victims of family abuse from both acts and threats of violence." *Robinson v. Robinson*, 886 A.2d 78, 86 (D.C.2005) (citation omitted). Accordingly, unlawful entry offenses cannot be categorically excluded from the def-

inition of "offenses upon the person" under the Intrafamily Offense Act.

## B. The entry of a CPO against Ms. Murphy was improper.

■ Having established that the offense of unlawful entry can serve as a basis for entering a CPO against a trespasser, we now turn to whether a CPO should have been entered against Ms. Murphy. We review the trial court's decision to enter a CPO for an abuse of discretion. *See e.g., McKnight v. Scott*, 665 A.2d 973, 977 (D.C.1995) (concluding no abuse of discretion in the trial court's granting of a permanent CPO when defendant assaulted petitioner, made harassing phone calls to her home, and sent faxes to her work); *Maldonado v. Maldonado*, 631 A.2d 40, 42 (D.C.1993) (reviewing trial court's extension of a CPO for abuse of discretion). In reviewing the trial court's decision for an abuse of discretion, we must determine "whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Coulibaly v. Malaquias*, 728 A.2d 595, 603 (D.C.1999) (quoting *Johnson v. United States*, 398 A.2d 354, 365 (D.C. 1979) (citation omitted)).

The finding of an unlawful entry does not automatically mean that the judge should enter a CPO against the offender, particularly when mutual petitions for CPO's have been filed. Rather, a judge should use his informed discretion and a CPO should only be entered against a party for reasons consistent with the un-

---

8. In 2006, the Council of the District of Columbia made even clearer that the District's unlawful entry statute is intended to protect persons as well as property. The Council amended that statute, along with other statutes, in response to public safety concerns and critical gaps in the criminal code. *See*

Omnibus Public Safety Amendment Act 2006, D.C. Sess. Law Serv. 16–306 (West); *see also* D.C.Code § 22–3302. This amendment focused on unlawful entry on vacant property as a public safety concern, not just as a concern about property rights.

derlying purpose of the Intrafamily Offense Act. In this case, we conclude the trial judge abused his discretion because he relied on an improper factor when he entered the CPO against Ms. Murphy.

During the CPO hearing, the trial judge stated that "[t]he statute is also designed, in my view, to prevent domestic violence, to prevent people who are in relationships either familial or romantic or whatever, from behaving violently toward each other and from *triggering violence in others.*" (Emphasis added). The trial judge improperly based his rationale for entering the CPO against Ms. Murphy, in part, because she was "triggering violence in [Mr. Okeke]."

During the criminal proceeding, the trial judge stated:

> There is no doubt in my mind that if M[s.] Murphy had behaved as a mature, rational, sober, intelligent adult, that we would not be here today. I think her behavior was obsessive, I think it was beyond irrational, I think it was more than immature ... at some level, whatever happened in that apartment, *I think she brought upon herself* .... (Emphasis added).

At the sentencing hearing for appellee's simple assault conviction, the trial court reiterated the same line of thinking:

> I'm very sorry Ms. Murphy was harmed by this. But I said it in the trial and I say it again today, *I think [her] own behavior brought a lot of this on her,* and her post-trial behavior may bring further punitive measures against her. That's unfortunate ... I don't think that it's appropriate to send Mr. Okeke to jail

in this case given the facts in this case. (Emphasis added).

The Intrafamily Offense Act was designed to prevent the type of violent assault Mr. Okeke committed against Ms. Murphy. *See Robinson, supra,* 886 A.2d at 86 (noting the broad remedial measures of the Intrafamily Offense Act are to safeguard a victim's safety and peace of mind); *Cruz–Foster, supra,* 597 A.2d at 931 (noting that while not strictly speaking a civil rights statute, the Intrafamily Offense Act was designed to counteract the abuse and exploitation of women). The issuance of mutual CPO's in this case was improper. The suggestion that a victim of domestic violence brings the harm on herself or himself, shifts the responsibility for the abuse onto the victim and does not hold the abuser accountable. In most jurisdictions, before entering mutual protection orders, the trial court must find that both parties posed a threat and that there is sufficient evidence to support the issuance of the order as to each. *See, e.g., In re the Marriage of Yates,* 148 P.3d 304, 317 (Colo. App.2006) (holding that a mutual protection order to prevent domestic abuse may be issued only if each party has met his or her burden of proof regarding the existence of an imminent danger to himself or herself); *see also Pearson v. Pearson,* 200 W.Va. 139, 488 S.E.2d 414, 424 (1997) (reversing the issuance of mutual restraining orders because the relevant provision under which the mutual restraining order was issued "ma[d]e it mandatory that a restraining order be entered against a spouse where it is shown by a preponderance of the evidence that such spouse abused the other spouse"); [9] *Uttaro v. Ut-*

---

9. In his dissent, Chief Judge Workman explained that "[m]utual restraining orders are common, but very bad practice." *Pearson,* 488 S.E.2d at 428. He goes on to explain that "this practice of mutual restraining or-

ders, while perhaps well-intentioned, causes more problems than it attempts to solve.... Boilerplate mutual restraining orders also diminish the principal goal of a restraining order, which is to provide protection from

*taro,* 54 Mass.App.Ct. 871, 768 N.E.2d 600, 604 (2002) ("allowing mutuality in restraining orders would chill the abuse prevention system established by [ ] placing the victim in fear of the consequences of strict (or lax) enforcement of prior orders").

Notwithstanding our holding that the CPO was improperly entered against Ms. Murphy, we nevertheless acknowledge that there are circumstances where mutual CPO's might be appropriate. *See Potting-er–Shand v. Shand,* 2001 WL 577132, *5 (Conn.Super.Ct. May 9, 2001) (holding that because the evidence was clear that both individuals had been violent with each other and that personal contact between the parties must be limited, mutual restraining orders were appropriate). However, that was not the case here. Ms. Murphy's failure to leave Mr. Okeke's apartment, after he had invited her to attend a party there, did not pose any actual or threatened danger to Mr. Okeke as his violent assault posed to Ms. Murphy. There is no evidence that when Mr. Okeke asked Ms. Murphy to leave his apartment, he feared any violence from her. To the contrary, the record reflects that at no time did Ms. Murphy pose a threat to Mr. Okeke. He testified at his criminal trial that Ms. Murphy hit and scratched him; however, when the police officers arrived he had no injuries or scratches on him. It is also important to note that Mr. Okeke did not seek, nor did the trial court issue, the CPO against Ms. Murphy on the basis of her threatening phone calls or her destruction of Mr. Okeke's property. Absent such additional evidence in this situation, where Mr. Okeke was the aggressor and crimi-

nally assaulted Ms. Murphy, a mutual CPO should not have been entered against her.

**C. Ms. Murphy's request for counsel fees should be reconsidered to determine if counsel fees would be proper at this juncture.**

█ Finally, Ms. Murphy argues that the trial court erred in denying her request for counsel fees. If the trial court has good cause to believe that the respondent has committed an intrafamily offense, the judge may issue a protective order, *inter alia,* awarding costs and counsel fees. D.C.Code § 16–1005(c)(8) (2001). "In considering whether the court erred in its rulings on the motions for attorney[ ] fees, our scope of review is a limited one because disposition of such motions is firmly committed to the informed discretion of the trial court." *Steadman v. Steadman,* 514 A.2d 1196, 1200 (D.C.1986); *see also Johnson, supra,* 398 A.2d at 365 (citation omitted).

When concluding whether to award counsel fees to either party in this case the trial court noted:

> "The general rule in our law in attorney[ ] fees is that you first have to determine whether one side, the litigation for one side has been burdensome or oppressive and you also have to factor in the motivation of the litigants. And if I determine as a result of that, that an award is appropriate, to then determine the amount of the award which goes to the quality and the nature of the services, the necessity of the services, and results obtained."

domestic violence to one who has been subjected to it." *Id.* Finally, he discusses the repercussions of violating a mutual restraining order by explaining that "the consequences of arrest for victims who have committed no violence or criminal act, but who

are bound by a mutual order are profound; victims may suffer a loss of good reputation, lose custody of children, find employment endangered, require burdensome fees for defense counsel and be unable of make bail." *Id.*

After laying out the proper standard, the court found that the litigation was neither burdensome nor oppressive, and Ms. Murphy was not entitled to counsel fees because she did not "achieve in this case ... any more than was achieved in the criminal case," and the trial judge "did not think the services were necessary." The trial court, however, also said as a general comment to the parties as he stated his findings of fact with regard to all pending claims:

> I must tell you ... I consider this case ... as troubling ... there are two seemingly intelligent and talented people who, in my view, each have significant personality defects.... And they have wasted time, effort, money, lawyers' time, Court time and have both, in my view, at various times testified incredibl[y] about some things. I don't find either one ... terribly believable overall. And it's just amazing to me that our community has to entertain this sort of thing that could have been easily avoided by either one of them. But that's where we are.

It appears that, based upon a fair reading of the entire transcript, the trial judge believed, at least in part, that each party was litigating senselessly, and he left the parties in the same financial position as he found them because each filed a petition for a CPO against the other, which he granted. In light of our reversal of the CPO against Ms. Murphy, we have a situation where only one party was successful in obtaining a CPO, and under D.C.Code § 16–1005(c)(8) counsel fees may be an appropriate remedy for the trial judge to reconsider.

In addition, while determining counsel fees based upon "results obtained" is a proper factor for consideration, we do not agree with the trial court's rationale that it was unnecessary for Ms. Murphy to pursue the CPO because the criminal prosecution achieved the same goals. Civil remedies were designed to be independent of any criminal prosecution. The Intrafamily Offense Act makes clear that "the institution of criminal charges by the United States attorney shall be in addition to, and shall not affect the rights of the complainant to seek relief under this subchapter." D.C.Code § 16–1002(c); *see also Report of the Council of the District of Columbia on the Judiciary on Bill 4–195, the Proceedings Regarding Intrafamily Offenses Amendment Act of 1982,* at 8 (May 12, 1982) ("criminal sanctions should not be the only avenue for such abuses" among family members). Furthermore, the trial court should take into account the important policy consideration that awarding counsel fees helps domestic violence victims to overcome the financial barrier of high legal costs and to assert their right to bring action against their aggressors. Otherwise, some victims might be dissuaded or prevented from filing a CPO petition.

The civil proceeding, in fact, yielded different results for Ms. Murphy than the criminal proceeding. She was protected from Mr. Okeke by extensions of the TPO from July 3, 2003 through April 23, 2004, which was well beyond the October criminal trial. Moreover, Ms. Murphy had no control over the criminal proceedings—appearing only as a witness—and any resulting stay-away order would only be enforced at the direction of the United States attorney. Lastly, in light of our reversal of the CPO entered against Ms. Murphy, she successfully defended against the entry of a CPO. We therefore remand for the trial court to reconsider Ms. Murphy's request for counsel fees and to determine whether counsel fees may be appropriate at this juncture.

### III. Conclusion

■ We reverse the trial court's entry of the CPO against Ms. Murphy and re-

mand to the trial court to vacate the CPO that was entered against her on April 23, 2004. We also remand to the trial court for further consideration of Ms. Murphy's request for counsel fees in light of our reversal of the entry of the CPO against her. We affirm the finding of criminal contempt against Ms. Murphy for violation of the Temporary Protection Order.[10]

*So ordered.*

10. We reject Ms. Murphy's contention that, because the Temporary Protection Order ("TPO") itself was invalid, her conviction for criminal contempt for violating the TPO was erroneous. Her sole basis for this contention is that the TPO statute did not allow for the multiple extensions of the TPO against her beyond fourteen days. Although § 16–1004(d)(1) provides for TPO's to be valid for only fourteen days when entered after *ex parte* hearings, the statute is silent as to the conditions and parameters for extending TPO's with the consent of both parties. We have not interpreted this silence to preclude the extension of a TPO for greater than fourteen days, or to prohibit repeated extensions, where—as in this case—both parties consented. *Prost v. Greene,* 652 A.2d 621, 623 (D.C. 1995) (TPO extension for one year with both parties' consent); *McKnight, supra,* 665 A.2d at 974 (multiple TPO extensions). The July 15, 2003, TPO against Ms. Murphy, which was subsequently extended by consent (or not objected to) was therefore valid.

The TPO ordered Ms. Murphy, among other things, not to contact Mr. Okeke by telephone. Although Ms. Murphy does not challenge the factual basis for the contempt charge, we note that although she denied intentionally making threatening calls to Mr. Okeke's phone, the court did not credit her testimony. Instead, the court found that she willfully violated the TPO. *See Baker v. United States,* 891 A.2d 208, 214 (D.C.2006) (we will affirm conviction for contempt of a CPO unless appellant establishes that the trial court's findings are plainly wrong or without evidence to support them) (citation omitted).