*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-FM-0418

ANTWAN K. GRAHAM, APPELLANT,

V.

T.T., APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-ASO-001242)

(Hon. Sean C. Staples, Trial Judge)

(Submitted November 4, 2025                    Decided November 26, 2025)

*Claudia Benz* was on the brief for appellant.

*T.T.*, pro se.

Before EASTERLY, DEAHL, and SHANKER, *Associate Judges*.

EASTERLY, *Associate Judge*: Antwan Graham challenges the trial court's determination by a preponderance of the evidence that he had stalked T.T., which formed the basis for the issuance of the court's anti-stalking order pursuant to D.C. Code § 16-1061 et seq. He argues that (1) the trial court erred when it considered the content of his protected speech, and (2) T.T. failed to present sufficient evidence either that he had engaged in the requisite course of conduct for stalking or that he

had the requisite culpable mental state during each of the incidents amounting to a course of conduct for stalking. We agree that the trial court erred by failing to consider whether Mr. Graham's speech was constitutionally protected speech that may not be punished as stalking. *See Mashaud v. Boone*, 295 A.3d 1139 (D.C. 2023) (en banc) (holding that the stalking statute only extends to constitutionally unprotected speech). And because we cannot say this error was harmless, we reverse without assessing the sufficiency of the evidence.

## I. Facts and Procedural History

T.T. was the sole witness who testified at the hearing on her motion for an anti-stalking order. She and Mr. Graham were neighbors; they lived in the same apartment building on 13th Street NW, on the ground floor. Of particular relevance, T.T.'s bedroom window was at the front of the building and was directly accessible from the street.

Prior to the four alleged incidents that gave rise to her motion, T.T. had had very little interaction with Mr. Graham and had seen him only a few times around the building. Then, on September 13, 2023, and November 30, 2023, Mr. Graham took food that had been delivered to the front door of her apartment. T.T. did not witness these incidents first-hand; rather, when she inquired with the building management about the stolen food, they told her Mr. Graham was the culprit and

provided her with video footage from the hallway camera, which she played in court.[1]  In December of the same year, Mr. Graham knocked on T.T.'s bedroom window and crudely propositioned her for sex on two separate occasions.  On the first occasion on December 28, 2023, Mr. Graham came to her window at 6:00 a.m., knocked three times,[2] and said, "come here; I got something for you[.]  I want you . . . I want to eat your pussy."  She "told him to get away" and that she was "going to call the cops" and Mr. Graham "ran away."  She reported the incident to the police.  Two days later, on December 30, Mr. Graham again came to her window at 4:00 a.m. and "banged" or "knocked" and "repeated the same thing that he said the first time he came," "come here, let me eat your privacy part."  When she told him to leave, he repeated, "ma'am, I'm trying to eat your privacy part."  T.T. then said she was going to call the police, and he ran away.  She filed a petition for a temporary anti-stalking order the next day.  She explained to the court that she filed the petition "because, not only that I'm afraid [for] my life, I am a victim of getting

---

[1] T.T. also testified that building management told her that Mr. Graham "often" took food that had been delivered to other residents in the building but, even though Mr. Graham was represented by counsel who might have considered this hearsay helpful to her client, the court sua sponte struck this testimony.

[2] On direct, T.T. testified that Mr. Graham knocked and that, in response, she looked out her window.  On cross, however, T.T. elaborated and said that, when Mr. Graham was knocking, "he put his energy into it, almost like knocking, trying to, you know, break it a little bit," but he did not try to open the window by sliding or lifting it.  Counsel for Mr. Graham impeached T.T. with the fact that she had only stated that he had "knocked" on her window in her petition for an anti-stalking order.

molested.[3] Also, I'm scared for my life because he is registered as a sex offender and has history as that."[4]

In his closing argument, Mr. Graham's attorney argued that Mr. Graham's conduct did not "rise to the statutory requirements of stalking." Regarding the two occasions where Mr. Graham was alleged to have taken T.T.'s food delivery, counsel argued he might have committed "a separate crime, but . . . [stealing food] would not cause anyone emotional distress that rises to the level of the statute." Counsel further argued that the two incidents of Mr. Graham knocking on T.T.'s window could not provide a foundation for a conclusion that he had committed the crime of stalking because his statements were protected speech under the First Amendment. To support this proposition counsel cited to this court's decision in *Mashaud*.

Although the court asserted it was "very familiar" with *Mashaud*, it took the position that *Mashaud* pointed in the "opposite" direction and that both the food-stealing and the window-knocking incidents supported a conclusion that Mr. Graham had committed the crime of stalking. According to the court, *Mashaud* "[is]

---

[3] It is unclear if T.T. was asserting that she had previously been molested or that she considered Mr. Graham's propositions for sex to be "molestation." Because of this lack of clarity and in an abundance of caution, we refer to T.T. by her initials.

[4] T.T. testified that when the police came, they told her that Mr. Graham was a sex offender, and she also "look[ed] it up."

all about context" and here, the court found that Mr. Graham

> has previously targeted the respondent by stealing her
> food, then makes clear claims [sic] at her. And he knows
> it's her apartment because he lives just down the
> hall . . . . And . . . then he makes these lewd and lascivious
> remarks to her and . . . flees when she tells him to get out
> of -- to leave these unwanted sexual advances.

On this basis, the court ruled that T.T. had proved by a preponderance of the evidence that Mr. Graham stalked her and granted her an anti-stalking order. The court reasoned that "[k]nocking on someone's window who is a virtual stranger to you in the early morning hours, and propositioning them for sexual acts, unwanted sexual acts, after having stolen their food on two occasions is the type of targeting that stalking is meant to deal with."

## II.    Analysis

A trial court may issue an anti-stalking order if it "finds by a preponderance of the evidence that the respondent stalked the petitioner, with at least one occasion of the course of conduct occurring within the 90 days prior to the date of petitioning." D.C. Code § 16-1064(c). The crime of stalking, in turn, requires proof that an alleged perpetrator "purposefully engaged in a course of conduct" defined as two or more occasions, "directed at a specific individual" that the perpetrator intended, knew, or at least should have known "would cause a reasonable person in the

individual's circumstances to . . . fear for his or her safety or the safety of another person; feel seriously alarmed, disturbed, or frightened; or suffer emotional distress." D.C. Code §§ 22-3133, 22-3132(8) (citations modified); *see also Mashaud*, 295 A.3d at 1148-49 (explaining that the alleged perpetrator must have the requisite mens rea for each incident forming the course of conduct). In reviewing such an injunctive order, this court defers to the trial court's findings of fact unless they are plainly wrong or without evidence to support them and views the evidence in the light most favorable to sustaining the trial court's ruling. *Mashaud*, 295 A.3d at 1150. We review the trial court's decision to grant injunctive relief based on this factual record for abuse of discretion. *Murphy v. Okeke*, 951 A.2d 783, 789 (D.C. 2008) (citing *McKnight v. Scott*, 665 A.2d 973, 977 (D.C. 1995)). A trial court abuses its discretion, inter alia, where "the record [does not] reveal sufficient facts upon which [its] determination was based"; the court "failed to apply the proper legal principles to its discretionary choice"; or, ultimately, where the court did not make a decision "within the range of permissible alternatives." *Johnson v. United States*, 398 A.2d 354, 364, 365, 368 (D.C. 1979).

The trial court in this case determined that there were four incidents that made up Mr. Graham's "course of conduct" directed at T.T.—two occasions when he stole food from the front door of her apartment and two occasions when he knocked on her window and, as the court found, "lewd[ly] and lascivious[ly]" "propositioned

[her] for sexual acts." We begin with the two food-stealing incidents because, if they constituted the requisite two occasions that could amount to a course of conduct to support a charge of stalking, we would not have to reach Mr. Graham's argument that the trial court impermissibly considered the statements he made during the window-knocking incidents. We conclude that the trial court erred in concluding either that these two food-stealing incidents were "directed at" T.T. or that Mr. Graham had the requisite mental state, i.e., that he "should have known his conduct would cause a reasonable person in [T.T.'s] circumstances to fear for . . . her safety," "feel seriously alarmed, disturbed, or frightened," or "suffer emotional distress."[5] D.C. Code § 22-3133(a)(3)(A-C) (citations modified).

First, there is no indication in the record that Mr. Graham "directed" his food-stealing specifically at T.T., D.C. Code § 22-3133(a), or even that he wanted anyone to know that the food had been stolen. As T.T. acknowledged, Mr. Graham did not take the deliveries "out of [her] hands," but rather took them "[i]n front of [her] door." And videos of the thefts indicate that Mr. Graham acted quickly so as not to draw anyone's, much less T.T.'s, attention. The trial court's finding that he "knows it's her apartment," is unsupported by the record. The court inferred this knowledge

---

[5] The stalking statute also applies to individuals who have actual purpose or knowledge to cause any of these harms, D.C. Code § 22-3133(a)(1)-(2), but for simplicity's sake we focus on the least demanding mens rea specified.

"because he lives just down the hall," but T.T. did not testify that Mr. Graham had ever seen her in the hall, and the video evidence she introduced shows that Mr. Graham could not see her doorway from his own because he had to turn a corner in the hallway to get to T.T.'s food. In short, T.T. failed to present evidence that these incidents were anything other than crimes of opportunity for the purpose of Mr. Graham obtaining free food.

Second, these facts preclude a determination that Mr. Graham should have known that his conduct would "cause a reasonable person in [T.T.'s] circumstances to fear for . . . her safety," "feel seriously alarmed, disturbed, or frightened," or "suffer emotional distress." D.C. Code § 22-3133(a)(3)(A-C) (citations modified). As this court explained in *Coleman v. United States*, 202 A.3d 1127, 1145 (D.C. 2019), "to trigger criminal liability, the level of fear, alarm, or emotional distress" to support a stalking incident "must rise significantly above that which is commonly experienced in day to day living . . . and must involve 'a severe[] intrusion on the victim's privacy and autonomy.' D.C. Code § 22-3131(a)." "Ordinary uneasiness, nervousness, [and] unhappiness are insufficient." *Id*.; *accord Keerikkattil v. United States*, 313 A.3d 591, 607 (D.C. 2024). Specifically with respect to "fear for safety," there must be proof of "fear of significant injury or a comparable harm" because the stalking statute is "meant to prohibit seriously troubling conduct, not mere unpleasant or mildly worrying encounters that occur on a regular basis in any

community." *Coleman*, 202 A.3d at 1144. Similarly, "emotional distress" must be "high, reaching a level that would possibly lead to seeking professional treatment." *Id*. at 1144-45. And "alarm" likewise requires a showing of "mental harm[] comparable to fear for one's safety or significant emotional distress." *Id.* at 1145 (relying on the principle of *noscitur a sociis*, i.e., the maxim that "a word [or phrase] is known by the company it keeps" and noting that the deletion of "seriously . . . annoying" from the stalking statute signals that "serious annoyance is insufficient"); *see also Flowers v. District of Columbia*, 343 A.3d 46, 52-53 (D.C. 2025) (explaining that the "preference for avoiding surplusage constructions is not absolute" and may "simply reflect an abundance of caution on the part of the legislature" (citation modified)). On the record before us, no court could determine that Mr. Graham should have known that his surreptitious food stealing from a person with whom he had no relationship would cause the level of mental harm required by the stalking statute.

Because we cannot rely on the food-stealing incidents, we turn to the window-knocking incidents on December 28 and 30. The trial court appeared to rely heavily on the "lewd and lascivious" content of what Mr. Graham said to T.T. As this court explained in *Mashaud*, however, to avoid running afoul of the First Amendment, the crime of stalking may not be proved by incidents of protected speech. 295 A.3d at 1144, 1160. To follow *Mashaud*, the trial court was obligated to consider whether

each of the two sets of statements that it found amounted to "propositioning [another adult] for sexual acts" fell within any of the well-established categories for constitutionally unprotected speech, namely, "threats, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Id.* at 1144; *see also id.* at 1160. The trial court did not conduct this analysis because it understood *Mashaud* to be "all about context." This is incorrect. As discussed, *Mashaud* precludes consideration of protected speech as part of the course of conduct needed to prove the crime of stalking. *See id.* at 1155-71. Context may inform whether speech is unprotected, but trial courts may not consider "context" free-floating from a First Amendment analysis of what constitutes protected speech.

The trial court's failure to assess whether Mr. Graham's statements were protected speech was not harmless. *See In re Ty.B.*, 878 A.2d 1255, 1266 (D.C. 2005) (adopting for civil cases a *Kotteakos*-type harm analysis[6] wherein an error is not harmless if this court is "unable to say with 'fair assurance' that the reception of hearsay evidence did not substantially affect the result"); *see also Johnson*, 398 A.2d at 366, 367 (explaining that a determination that a trial court abused its discretion encompasses a determination of harm). To assess harm, we need only look to the December 28 incident because, without it, there would be no proof of a "course of

---

[6] *Kotteakos v. United States*, 328 U.S. 750 (1946).

conduct" of stalking. *See* D.C. Code § 22-3132(8). We conclude that Mr. Graham's statements on that day crudely propositioning T.T. for sex do not fall into any of the categories for unprotected speech, and we do not have "fair assurance" that the trial court would have concluded that the December 28 incident constituted an incident of stalking without considering these statements.

Mr. Graham's statements were manifestly not defamatory, fraudulent, or a call to incitement. His statements cannot be classified as obscenity, despite their sexual nature. "[S]ex and obscenity are not synonymous. Obscene *material* is *material* which deals with sex in a manner appealing to prurient interest." *Roth v. United States*, 354 U.S. 476, 487 (1957) (emphasis added). We know of no court that has held that an adult's verbal request to engage in sexual activity with another adult— even an unwanted and crude request—can be considered "obscene *material*" within the meaning of the First Amendment and we decline to be the first. Nor were Mr. Graham's statements "integral to criminal conduct," unless that conduct is stalking; but we rejected such an argument as "fatally circular" in *Mashaud*, 295 A.3d at 1171 (explaining that to fall under this exception, "the speech must be integral to conduct that constitutes another offense that does not involve protected speech," because "it makes no sense as an exception if the speech both constitutes the crime itself and thereby avoids First Amendment protections by being integral to its own commission" (quoting *United States v. Sryniawski*, 48 F.4th 583, 588 (8th Cir.

2022))).

This leaves threats. True threats are "serious expression[s] conveying that a speaker means to commit an act of unlawful violence," and a defendant must have a "subjective" understanding of his statements' threatening character. *Counterman v. Colorado*, 600 U.S. 66, 73-74 (2023) (citation modified). Because the First Amendment protects the "clueless speaker [who] fails to grasp his expression's nature and consequence," *id*. at 77, it is not enough that Mr. Graham spoke negligently, i.e., that a reasonable person would have known that his expression of interest in sexual activity with T.T. would put her in fear of a sexual assault. *See id*. at 79 n.5. Rather, we must be able to conclude that Mr. Graham spoke recklessly— he must have been subjectively "aware that [T.T.] could regard his statements as threatening violence and deliver[ed] them anyway." *Id*. at 79 (citation modified); *see also id*. at 78 (acknowledging that adding a subjective element to unprotected speech undoubtedly "has a cost: Even as it lessens chill of protected speech, it makes prosecution of otherwise proscribable, and often dangerous, communications harder"). The evidence does not support such a conclusion. As the trial court found and as the record supports, Mr. Graham simply "propositioned [T.T.] for sexual acts" ("I want to . . . "); he never suggested that he would proceed forcibly or attempt to hurt her. To the contrary, he left when she told him to go away and said that she was calling the police. And speaking to T.T. from a location outside the building, where

others could possibly hear and see him from the street, further weighs against inferring that he was aware that his statements might be perceived as threatening sexual assault. In short, as distasteful as his conduct was, there is nothing in the record to suggest that he wanted to use force or violence to engage in nonconsensual sexual activity with T.T. or was aware that T.T. might fear that was his aim. *Mashaud*, 295 A.3d at 1157 (explaining that "it is a foundational principle of the First Amendment that speech cannot be restricted simply because it is upsetting or arouses contempt"; "the First Amendment protects lots of speech that is substantially emotionally distressing"; and "if there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable") (citation modified).

With the understanding that Mr. Graham's constitutionally protected speech on December 28 cannot be punished as stalking, we look to his conduct on that date, namely his act of knocking on T.T.'s bedroom window at 6 a.m. *See id.* at 1161 (explaining how the court can consider the act of communicating, provided that "we [] ignore the content of [any] communications"). Here, we cannot say with confidence that the trial court would have ruled that Mr. Graham's window-knocking on that date, without consideration of his speech, constituted an incident of stalking, i.e., that it was "a severe[] intrusion on [T.T.'s] privacy and autonomy,"

such that Mr. Graham should have known that it would cause a reasonable person the requisite "fear, alarm, or emotional distress," discussed above. We note that the trial court found that Mr. Graham knocked at T.T.'s window—not that he attempted to break the glass; there are a number of innocuous-perhaps-rising-to-annoying reasons someone might knock on a person's window; there is no evidence that, at least on December 28, Mr. Graham knew he was knocking on T.T.'s *bedroom* window; and, as the trial court also found, once T.T. told Mr. Graham to leave, he ran away. In short, based on the record and the court's findings, we cannot say it is "*highly probable* that [that] error did not contribute to the verdict." *In re Ty.B.*, 878 A.2d at 1267.

Accordingly, we conclude that the trial court abused its discretion in failing to evaluate Mr. Graham's speech under *Mashaud* and the First Amendment and that this error was harmful. We reverse on this basis without considering Mr. Graham's challenge to the sufficiency of the evidence. *See Ty.B.*, 878 A.2d at 1266 (distinguishing the analysis of harmlessness from sufficiency). Unlike in criminal cases where we must always assess the sufficiency of the evidence first to ensure that the double jeopardy clause is not violated in the event of a reversal and a remand for a new trial, *see Smith v. United States*, 175 A.3d 623, 627 (D.C. 2017), we often defer assessments of the sufficiency of the evidence in civil cases. *See, e.g., D.C. Dep't Mental Health v. D.C. Dep't of Emp. Services*, 15 A.3d 692, 694 (D.C. 2011)

(reversing and remanding on grounds of legal error and declining to "decide whether the evidence would have been sufficient to support a ruling in the employee's favor"). And there is good reason to do so here. Not only do we lack fair assurance that the trial court would have issued the anti-stalking order on the current record minus Mr. Graham's speech on December 28, it may be that T.T. or Mr. Graham will, on remand, seek to reopen the record to present new evidence in support of or in opposition to an anti-stalking order. *Cf. Carome v. Carome*, 262 A.3d 242, 249 (D.C. 2021) (explaining that when "a trial court revisits a CPO petition on remand based on an error in the original ruling, the trial court's renewed inquiry is not limited to whether its initial decision was correct based on the original record" and may encompass "evidence of any relevant developments that occurred in the time between the trial court's initial ruling on the CPO petition and this court's remand decision"); *J.O. v. O.E.*, 100 A.3d 478, 483 (D.C. 2014) (authorizing trial court on remand to "reopen the hearing to take additional evidence" on petition for CPO); *Cruz-Foster v. Foster*, 597 A.2d 927, 932 (D.C. 1991) ("Since any CPO which may be entered will look to the future, the judge is of course authorized to conduct further proceedings to determine whether there have been any developments since she last heard the case which would affect [petitioner's] right to relief.").

We thus reverse the trial court's anti-stalking order and remand for further proceedings consistent with this opinion.

*So ordered.*