# District of Columbia
# Court of Appeals

**No. 14-FM-391**

EDMUND FLEET,

Appellant,

FILED

MAY - 5 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**CPO-785-14 &
CPO-799-14**

ERICKA FLEET,

Appellee.

On Appeal from the Superior Court
of the District of Columbia

BEFORE: GLICKMAN and MCLEESE, *Associate Judges*; and RUIZ, *Senior Judge*.

**J U D G M E N T**

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the trial court is affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: May 5, 2016.

Opinion by Associate Judge Roy W. McLeese.

Opinion, dissenting in part, by Senior Judge Vanessa Ruiz.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-FM-391

EDMUND FLEET, APPELLANT,

v.

ERICKA FLEET, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CPO-785-14 & CPO-799-14)

(Hon. Marisa J. Demeo, Trial Judge)

(Argued March 26, 2015                    Decided May 5, 2016)

*Matthew Bechak* and *Jennifer Anukem* for appellant.

*Daniel S. Shaivitz* for appellee.

Before GLICKMAN and MCLEESE, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion for the court by *Associate Judge* MCLEESE.

Opinion by *Senior Judge* RUIZ, dissenting in part, at page 21.

MCLEESE, *Associate Judge*: Appellant Edmund Fleet challenges the trial court's order granting a civil protection order (CPO) to appellee Ericka Fleet and denying a CPO to Mr. Fleet. We affirm.

**I.**

Mr. Fleet and Ms. Fleet were married in 2010 and separated in 2013. They have a child in common who was born in 2013. In connection with an ensuing divorce action, the trial court granted Ms. Fleet temporary custody over the child, with scheduled visitation for Mr. Fleet. In March 2014, Ms. Fleet and Mr. Fleet each filed a petition for a CPO against the other. The trial court held a hearing on the petitions. In pertinent part, the evidence at the hearing was as follows.

On March 4, 2014, at a hearing in the divorce matter, the trial court addressed interim arrangements with respect to the Fleets' cars. Mr. Fleet wanted to arrange an exchange of the cars that each possessed at that time. The parties could not agree, so the trial court stated that "[e]verything stays status quo." On the morning of March 10, 2014, Ms. Fleet went with the child to the parking lot outside of Mr. Fleet's place of work. Ms. Fleet intended to take possession of the car that Mr. Fleet had been driving, which was titled in her name. After Ms. Fleet placed the child in the back seat of the car, Mr. Fleet came out of the building and sat in the front seat of the car.

Ms. Fleet testified that she told Mr. Fleet to leave the car, but he ignored her and instead screamed to a bystander to call the police and to videotape the incident. Ms. Fleet asked Mr. Fleet to let her leave with the child, but Mr. Fleet refused and insisted that they wait until the police arrived. Ms. Fleet called the police, because Mr. Fleet would not let the child out of the car. The police arrived after five or ten minutes and determined that Ms. Fleet was the owner of the car. The officers therefore told Mr. Fleet that Ms. Fleet could take the car and that he should remove his belongings from the car.

Mr. Fleet then took the child out of the car and into his office building. The officers asked Ms. Fleet whether Mr. Fleet was supposed to have the child, and she indicated that he was not, because she had custody of the child at that time. Ms. Fleet had a copy of the custody order on her phone and showed it to the police. A police officer went into the building and returned with the child within less than three minutes. Ms. Fleet was nervous and distressed, and the child was crying. Ms. Fleet left with the child and did not take the car.

Ms. Fleet also introduced evidence of an incident in February 2014 during a doctor's appointment for the child. According to Ms. Fleet, she and Mr. Fleet had an argument in the waiting room about the child's visitation schedule. During the

argument, Mr. Fleet cursed at Ms. Fleet and physically blocked Ms. Fleet and the child from leaving the room. After Ms. Fleet screamed for help, a nurse asked Mr. Fleet to leave, but he became belligerent and refused to leave. The police were called, but by the time they arrived the situation had calmed down. The incident scared Ms. Fleet and left her upset and intimidated. She concluded that Mr. Fleet hated her and was angry at her.

With respect to the incident on March 10, 2014, Mr. Fleet testified that he saw through the window of his office that Ms. Fleet was trying to take the car he had been driving. Mr. Fleet understood the trial court to have previously ordered that he and Ms. Fleet should keep possession of the cars they had been driving. He therefore ran outside, locked himself in the car, and called the police. Ms. Fleet was standing outside the car cursing at Mr. Fleet. Even after the police arrived, Ms. Fleet was agitated and out of control. Mr. Fleet therefore took the child from the car into his office. Police officers came into the office and told Mr. Fleet that he could not keep the child. Mr. Fleet immediately surrendered the child. Although he knew that he did not have custody of the child at the moment he took the child, he took the child because the child was in an unsafe environment, with Ms. Fleet "acting crazy and spewing expletives."

With respect to the incident at the doctor's office, Mr. Fleet testified that it was Ms. Fleet who began yelling and that he never tried to block the door.

The trial court granted a CPO to Ms. Fleet. The trial court found that there was good cause to believe that Mr. Fleet committed parental kidnapping during the incident on March 10, 2014. *See* D.C. Code § 16-1005 (c) (2015 Supp.) (trial court may issue CPO on finding good cause to believe that respondent committed or threatened to commit criminal offense against petitioner). In pertinent part, the trial court concluded that Mr. Fleet took the child with the intent to prevent Ms. Fleet from exercising her right to custody of the child. *See* D.C. Code § 16-1022 (b)(1) (2012 Repl.) (parent commits parental kidnapping if parent knowingly abducts, takes, or carries away child from lawful custodian, intending to prevent lawful custodian from exercising right to custody). Specifically, the trial court found that Mr. Fleet knew that he did not have a right to custody at the time he took the child; that Mr. Fleet's act of taking the child from the car into his office constituted a taking or carrying away within the meaning of the parental-kidnapping statute; and that Mr. Fleet intended to prevent Ms. Fleet from exercising her rights to custody of the child. The trial court acknowledged Mr. Fleet's claim that he was acting to protect the child from harm, but concluded that there was no evidence that the child was in imminent danger of physical harm or

was suffering any emotional harm. *See* D.C. Code § 16-1023 (a)(1) (2012 Repl.) (parent has defense to parental kidnapping if action was "taken to protect the child from imminent physical harm").

The trial court further found that issuing a CPO against Mr. Fleet would be consistent with the underlying purposes of the Intrafamily Offenses Act, D.C. Code § 16-1001 et seq. (2012 Repl.). Specifically, the trial court explained that the parties "have had a turbulent relationship that has often teetered on the edge of violence." The trial court described the parental-kidnapping offense as troubling, noting that such offenses can "escalate to a violent situation quickly as emotions easily would be expected to run high in matters involving children being taken away from a parent." The trial court further noted that Mr. Fleet himself had recognized that the incident on March 10, 2014, created a "volatile situation," leading Mr. Fleet to send one of his parents to pick up the child for the next visitation. The trial court pointed out that, in their petitions in the present case, the Fleets had also accused each other of committing assault, theft, and unlawful entry, arising from the February 2014 incident at the doctor's office; an incident earlier on March 10, 2014, at the marital residence; and the March 10, 2014, incident outside of Mr. Fleet's office. Although the trial court did not find good cause to believe those alleged crimes had been committed, the trial court viewed those

allegations as demonstrating a contentious relationship. Finally, the trial court noted that there had been two other CPO cases in 2013, in which the parties accused each other of destruction of property, assault, and threats, including a death threat. Acknowledging that the parties had voluntarily dismissed those CPO petitions, the trial court concluded that there was a pattern of allegations and discord that could eventually threaten the safety of the Fleets and their child.

The trial court denied Mr. Fleet's petition for a CPO. In pertinent part, the trial court concluded that there was not good cause to believe that Ms. Fleet had committed or threatened to commit theft of the car during the incident on March 10, 2014, because Ms. Fleet was the legal owner of that car.

## II.

Mr. Fleet challenges the trial court's issuance of the CPO against him on four principal grounds. We are not persuaded by those challenges.

## A.

Mr. Fleet argues that briefly taking the child into his office building did not amount to an abduction, taking, or carrying away of the child within the meaning

of the parental-kidnapping statute.  We conclude otherwise.

As a matter of ordinary language, Mr. Fleet indisputably took the child from the car, and from the physical custody of Ms. Fleet, and carried the child away and out of sight into the office building.  Although Mr. Fleet argues that the taking and carrying away were minimal in duration and distance, we see no basis for interpolating minimum duration or distance requirements into § 16-1022 (b)(1), which by its terms extends to any abduction, taking, or carrying away, without regard to duration or distance.  We have held with respect to the general kidnapping statute that "there is no requirement that the victim be moved any particular distance or held for any particular length of time." *Richardson v. United States*, 116 A.3d 434, 439 (D.C. 2015).  We reach the same conclusion with respect to § 16-1022 (b)(1).  In contrast, another provision of the parental-kidnapping statute does contain an explicit durational requirement.  D.C. Code § 16-1002 (b)(3) (addressing situation where relative with limited custody of child retains custody for more than 48 hours after lawful custodian demands return).

Mr. Fleet also argues that he did not conceal the child, but rather simply took the child to his nearby office, where Ms. Fleet and the officers could readily locate

him and the child.  The trial court held to the contrary that Mr. Fleet did conceal the child, in violation of D.C. Code § 16-1022 (a).  We need not and do not address that issue, because we conclude that the CPO is adequately supported by the trial court's finding that there was good cause to believe that Mr. Fleet violated § 16-1022 (b)(1) by taking and carrying away the child with the requisite intent.  For current purposes, we assume that Mr. Fleet did not conceal the child.  That assumption, however, does not aid Mr. Fleet under § 16-1022 (b)(1), because that provision by its terms does not require proof of concealment.

**B.**

Mr. Fleet argues that there was insufficient evidence that he intended to interfere with Ms. Fleet's right to exercise custody of the child.  Ms. Fleet bore the burden of proof on this issue by a preponderance of the evidence.  *J.O. v. O.E.*, 100 A.3d 478, 481 & n.8 (D.C. 2014).  We review the trial court's finding on the issue deferentially, "giving full play to the right of the judge, as trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." *In re K.M.*, 75 A.3d 224, 230 (D.C. 2013) (internal quotation marks omitted); *see also* D.C. Code § 17-305 (a) (2012 Repl.) (where trial judge acted as finder of fact, judgment "may not be set aside except for errors of law unless it appears that the

judgment is plainly wrong or without evidence to support it"). We uphold the trial court's finding.

Mr. Fleet admittedly knew that he did not have a right to custody of the child at the time he took the child. He contends, however, that his intent in taking the child was not to interfere with Ms. Fleet's right to custody of the child but rather to protect the child from a dangerous situation. The trial court, however, was not required to credit Mr. Fleet's testimony about his motives. *See, e.g.*, *Staton v. United States*, 466 A.2d 1245, 1252 (D.C. 1983) ("The trier need not believe the testimony of a witness even though the witness'[s] testimony is uncontradicted[], particularly where the witness has a personal interest in the result.") (citations omitted). Moreover, the trial court found that there was no evidence that the child was in imminent danger of physical harm or was suffering any emotional harm. Those findings raise a question about the credibility of Mr. Fleet's claimed motive.

In any event, the trial court appeared to assume that Mr. Fleet may have been motivated at least in part by a desire to protect the child, but held that Mr. Fleet also intended to interfere with Ms. Fleet's right to remain in physical control of the child. In support of that conclusion, the trial court noted that Mr. Fleet took the child farther away than would have been necessary if protection of the child

were his only motive, instead removing the child from Ms. Fleet's view and making it impossible for Ms. Fleet to leave with the child had she chosen to do so. We also note that Mr. Fleet had readily inferable reasons to want to interfere with Ms. Fleet's right to physical custody of the child, including anger that Ms. Fleet was trying to take a car Mr. Fleet believed he was entitled to possess and a desire to prevent Ms. Fleet from leaving with the car. Finally, we note that the trial court's finding is supported by the general principle that a factfinder may infer that people intend the natural and probable consequences of their acts knowingly done. *See, e.g.*, *Corbin v. United States*, 120 A.3d 588, 591 n.3 (D.C. 2015). For these reasons, we conclude that the record permitted the trial court to find by a preponderance of the evidence that Mr. Fleet intended to interfere with Ms. Fleet's right to physical custody of the child.

## C.

Mr. Fleet argues that the evidence was insufficient to overcome two related defenses: that he was protecting the child from imminent physical harm, D.C. Code § 16-1023 (a)(1); and that his actions were justified under the common-law defense of necessity, *see, e.g.*, *Morgan v. Foretich*, 546 A.2d 407, 411 (D.C. 1988) ("Criminal law recognizes the doctrine that an otherwise criminal act is excused if

the harm that would have resulted from compliance with the law would have significantly exceeded the harm actually resulting from the defendants' breach of the law. This defense of necessity does not require proof that harm is actually occurring, but only that the defendant have a reasonable belief that harm is imminent. It does not exonerate one who has the opportunity to resort to a reasonable legal alternative to violating the law.") (internal citations and quotation marks omitted). We disagree.

At the time Mr. Fleet took the child from Ms. Fleet's physical custody, there had been no violence or threats of violence. Although there had been a heated verbal dispute, the police were on the scene. Under the circumstances, the trial court reasonably concluded that there was no evidence that the child was in imminent danger of physical harm or was suffering any emotional harm. In the absence of such evidence, the trial court could permissibly reject Mr. Fleet's defenses. It is true, as Mr. Fleet points out, that the trial court did not explicitly frame its holding in terms of what Mr. Fleet could reasonably have believed. But the trial court's holding that there was no evidence of imminent danger of physical harm or of emotional harm implies that there was no basis upon which Mr. Fleet could have had a reasonable belief that he needed to act to prevent such harm. *Cf. generally, e.g.*, *Jordan v. Jordan*, 14 A.3d 1136, 1147-51 (D.C. 2011) (upholding

judgment based on trial court's implicit findings).

## D.

Mr. Fleet argues that the trial court abused its discretion, because granting a CPO against him did not advance the purposes of the Intrafamily Offenses Act. *See generally Salvattera v. Ramirez*, 111 A.3d 1032, 1037 (D.C. 2015) ("[T]he trial court, in the exercise of its discretion, should only enter a CPO against a party for reasons consistent with the underlying purposes of the Intrafamily Offenses Act.") (alterations and internal quotation marks omitted); *Robinson v. Robinson*, 886 A.2d 78, 86 (D.C. 2005) ("[T]he broad remedial purpose of the Intrafamily Offenses Act . . . is[] to protect victims of family abuse from both acts and threats of violence."); *Maldonado v. Maldonado*, 631 A.2d 40, 42 (D.C. 1993) ("The Intrafamily Offenses Act is a remedial statute and as such should be liberally construed for the benefit of the class it is intended to protect."). We find no abuse of discretion.

The trial court in this case carefully considered whether granting a CPO against Mr. Fleet would be consistent with the purposes of the Intrafamily Offenses Act. In determining that a CPO was warranted, the trial court emphasized four

points: (1) the parental kidnapping at issue in this case was troubling, because such kidnappings can quickly escalate into violence; (2) Mr. Fleet himself recognized that the incident on March 10, 2014, created a "volatile situation"; (3) the present CPO petitions were part of a series of allegations that demonstrated the contentious relationship between the parties; and (4) previous CPO petitions, although voluntarily withdrawn, included serious allegations of assault, threats, and destruction of property. Taken together, the trial court explained, these considerations supported a conclusion that the parties' interactions could eventually threaten their safety and that of the child, and that a CPO was warranted to "ensure peace and safety." *Robinson*, 886 A.2d at 86.

We see no basis upon which to second-guess the trial court's discretionary determination that a CPO against Mr. Fleet was warranted in the circumstances of this case. We are not persuaded by Mr. Fleet's arguments to the contrary.

First, Mr. Fleet argues that the trial court could not properly grant a CPO against him without finding that Ms. Fleet or the child felt threatened or fearful. We disagree. We have never held or even suggested that proof of subjective fear by the CPO petitioner or anyone else is a prerequisite to issuance of a CPO. *Cf., e.g.*, *Richardson v. Easterling*, 878 A.2d 1212, 1217 (D.C. 2005) (rejecting

argument that CPO may not issue unless abuse or violence has been alleged; "[W]e may not read into the Act limitations or restrictions which it does not contain."). Moreover, there was evidence that Ms. Fleet feared Mr. Fleet, and the trial court reasonably found that there was an objective basis for concern that the discord between Mr. Fleet and Ms. Fleet could eventually threaten the safety of the parties and the child.

Second, Mr. Fleet emphasizes the trial court's statement that Mr. Fleet had not compromised the child's safety and Ms. Fleet's statement that she did not think Mr. Fleet would harm the child. The CPO, however, is focused not solely on the child but also on Ms. Fleet. Moreover, the trial court ultimately concluded, based on a reasonable assessment of all of the evidence, that a CPO was justified to protect the safety of both Ms. Fleet and the child.

Third, Mr. Fleet argues that granting a CPO against him is unjustified because the March 10, 2014, incident was precipitated by Ms. Fleet's misconduct in trying to take the car from Mr. Fleet contrary to court order. We agree that, in light of the prior court order, Ms. Fleet should not have unilaterally tried to take possession of the car Mr. Fleet was driving. But the conclusion that Ms. Fleet precipitated the incident neither justifies Mr. Fleet's response nor precludes the

trial court from issuing a CPO based on the totality of the circumstances. *Cf. Murphy v. Okeke*, 951 A.2d 783, 790-91 (D.C. 2008) (rejecting reasoning that CPO petitioner's obsessive, immature, and irrational conduct was responsible for CPO respondent's assault on petitioner).

Finally, Mr. Fleet objects to the trial court's reliance on the allegations in the 2013 CPO petitions that were voluntarily withdrawn. We have said, however, that a trial court considering whether to issue a CPO should "look at the entire mosaic of facts." *Salvattera*, 111 A.3d at 1037 (internal quotation marks omitted). Moreover, the trial court appropriately treated the allegations as just that -- allegations reflecting the contentious nature of the parties' relationship -- without assuming that the allegations were true. We perceive no error. *Cf., e.g.*, *Murphy*, 951 A.2d at 785 n.2 (trial court may in some circumstances take judicial notice of records from other proceedings involving same parties and subject matter).

In sum, we uphold the trial court's decision to grant a CPO against Mr. Fleet.

**III.**

Our differences with the dissent are primarily factual. From the dissent's perspective, Mr. Fleet acted reasonably, or at least in good faith, to protect his daughter, rather than with the impermissible purpose of interfering with Ms. Fleet's custody. The question for us on appeal, however, is not what perspective we would have adopted if we had been the fact-finder. Rather, we must review the trial court's ruling deferentially to determine whether the ruling is "plainly wrong or without evidence to support it." D.C. Code § 17-305 (a); *see also, e.g.*, *In re Ferguson*, 54 A.3d 1150, 1152 (D.C. 2012) ("In CPO violation cases, we must view the evidence in the light most favorable to sustaining the judgment.") (brackets and internal quotation marks omitted). Given the evidence relied upon by the trial court, we are unable to say that the trial court clearly erred by concluding that Mr. Fleet intended to interfere with Ms. Fleet's custody when he took the child away from Ms. Fleet into his office and out of her view. We are equally unable to conclude that the trial court abused its discretion by deciding to issue a CPO.

We do not agree with the dissent's statement that Ms. Fleet was not "prevented from asserting" her right to custody over the child. To the contrary,

Mr. Fleet took the child away from Ms. Fleet and out of her view, thereby preventing Ms. Fleet from exercising physical custody over the child. Moreover, even if we were otherwise inclined to recognize an exception to the parental-kidnapping statute for incidents that could be viewed as de minimis, that would not alter our conclusion in this case, because the trial court reasonably viewed Mr. Fleet's conduct in this case as "troubling" and as posing risks of "escalat[ion] to a violent situation." Finally, our affirmance of the trial court's ruling in this case in no way implies that a CPO could properly issue based on the changing of a diaper or a slight movement of a child. On those facts alone, it is difficult to imagine how a reasonable fact-finder could find either that the defendant intended to interfere with parental custody or that the child was "tak[en] or carr[ied] away" within the meaning of D.C. Code § 16-1022 (b)(1).

## IV.

Mr. Fleet also challenges the trial court's decision not to grant a CPO against Ms. Fleet. We affirm that ruling.

We first address a threshold issue. In his notice of appeal, Mr. Fleet provided the case number relating to Ms. Fleet's petition for a CPO (CPO-785-14)

but did not provide the case number relating to Mr. Fleet's petition for a CPO (CPO-799-14). Ms. Fleet argues that Mr. Fleet's appeal should therefore be dismissed to the extent that Mr. Fleet seeks review of the trial court's denial of Mr. Fleet's petition for a CPO. In the circumstances of this case, however, we conclude that dismissal is not warranted. The two cases at issue do not appear to have been formally consolidated, but they were consolidated for all practical purposes. They were called for trial on the same day, were tried in a single proceeding before a single judge, and resulted in a single judgment. Mr. Fleet's notice of appeal accurately names the judge who decided both cases and provides the date of the decision of both cases. It refers to both parties, although it characterizes Ms. Fleet as the petitioner and Mr. Fleet as the respondent, which was true of case No. CPO-785-14 but not case No. CPO-799-14.

This court does not appear to have decided whether a notice of appeal that provides the case number of only one of two cases in such circumstances is for that reason fatally defective as to the omitted case. The federal law we have found on the point, however, has concluded that such omissions are not fatal. *See, e.g.*, *United States v. Parks*, 581 Fed. App'x 575, 576 n.1 (7th Cir. 2014) (defendant's failure to include on notice of appeal case number relating to kidnapping conviction did not preclude appellate review of that conviction, because defendant

included case number of robbery conviction and robbery and kidnapping cases had been consolidated and resulted in a single judgment) (citing cases).  We reach the same conclusion in the present case, particularly given the absence of any claim of prejudice by Ms. Fleet.

On the merits, we affirm the trial court's decision not to grant a CPO against Ms. Fleet.  Such a CPO may not issue unless the trial court finds by a preponderance of the evidence that the CPO respondent committed or threatened to commit a criminal offense.  D.C. Code § 16-1005 (c); *see J.O.*, 100 A.3d at 481 & n.8.  With respect to the incident in the parking lot on March 10, 2014, Mr. Fleet ultimately argued in the trial court only that Ms. Fleet threatened to commit the offense of theft, by trying to take the car Mr. Fleet had been driving.  The trial court concluded, however, that there was not good cause to believe that Ms. Fleet had threatened to commit theft, because Ms. Fleet was the legal owner of the car. In this court, Mr. Fleet has abandoned the theory that Ms. Fleet had threatened to commit theft, instead arguing that Ms. Fleet had committed unlawful entry, in violation of D.C. Code § 22-2302 (2012 Repl.).  In response, Ms. Fleet pointed out that Mr. Fleet had not relied on § 22-2302 in the trial court.  Ms. Fleet also argued that § 22-2302 is limited to real property.  In his reply brief, Mr. Fleet shifted again, relying on D.C. Code § 22-1341 (2012 Repl.) (prohibiting unlawful entry

into motor vehicle).

"[I]t is fundamental that arguments not raised in the trial court are not usually considered on appeal." *Jordan*, 14 A.3d at 1153 (D.C. 2011).  We see no unusual circumstances warranting a departure from that general rule in this case, particularly given that it appears to be an open question in this jurisdiction whether a person having legal title to a motor vehicle can be found guilty under § 22-1341. *See, e.g.*, *Jordan*, 14 A.3d at 1153 (reviewing argument not properly raised in trial court only for plain error affecting substantial rights and resulting in miscarriage of justice or seriously affecting fairness and integrity of proceeding).  We therefore affirm the trial court's denial of Mr. Fleet's petition for a CPO against Ms. Fleet.

The judgment of the trial court is therefore

*Affirmed.*

RUIZ, *Senior Judge*, dissenting in part.  This appeal presents us, for the first time, with an opportunity to interpret the parental kidnapping statute, D.C. Code § 16-1022  (2012 Repl.), and to provide needed guidance on what the statute requires

in terms of proof.[1]  The operative facts in this case are simple and undisputed:  In contravention of a court instruction, Ms. Fleet went to Mr. Fleet's workplace, with their fourteen-month-old daughter, with the intent to surreptitiously take the car that Mr. Fleet had been using. The car was parked in the parking lot in front of THEARC (Town Hall Education Arts Recreation Campus), a well-known community arts center where Mr. Fleet has been the Executive Director for ten years.  Ms. Fleet placed the child in the parked car that she was trying to spirit away.  Mr. Fleet observed what was happening from his office window at the front of THEARC, came out to the parking lot, sat in the car with the child (where Ms. Fleet had placed her), and called for a police officer to intervene in Ms. Fleet's unlawful attempt to remove the car.  Ms. Fleet became angry and started to yell and curse at him to get out of the car and also called the police.  Mr. Fleet exited the car with the child and walked with the infant, in her car seat, to his office.  He testified that he did so because he wanted to "protect his daughter" by removing

---

[1]  After the case was argued on appeal, this court remanded the record to the trial court for "explicit findings" on whether there was good cause to believe that Mr. Fleet had violated D.C. Code § 16-1022 (b)(1) and, if good cause was found, for an "explicit determination, including a statement of reasons," as to whether issuance of a civil protection order based on a finding of good cause "in the circumstances of this case, would be 'consistent with the underlying purpose of the Intrafamily Offense[s] Act.' *Murphy v. Okeke*, 951 A.2d 783, 786 (D.C. 2008); *see also Robinson v. Robinson*, [886 A.2d 78], 86-87 (D.C. 2005)." *Fleet v. Fleet*, No. 14-FM-391, Order dated April 9, 2015.  The court now reviews the record, including the trial court's order on remand.

her from the tense encounter and Ms. Fleet's angry outburst. His actions took place in a public area, in broad daylight, in the presence of Ms. Fleet, police officers who responded to the Fleets' calls, and several passers-by. When Ms. Fleet demanded through a police officer that the child be returned to her because Mr. Fleet's visitation was not scheduled until that afternoon, Mr. Fleet, immediately and without resistance, turned the child over.

It is undisputed that Ms. Fleet was in the wrong in trying to take the car from Mr. Fleet's parking lot.[2] Their argument was over possession of the car, not custody of the child. As the majority acknowledges, the entire incident, from when Ms. Fleet arrived with the child planning to take the parked car, to when she left with the child was about twenty minutes. Within that time frame, the trial court found, the actions that constituted "parental kidnapping" — from when Mr. Fleet

---

[2] The Fleets had two cars. The one being used by Mr. Fleet was titled in Ms. Fleet's name. The one being used by Ms. Fleet was leased. The trial court in the divorce case had deferred making any changes on who should have which car and instructed the parties only the previous week to keep the status quo pending further order of the court. Ms. Fleet, however, decided to take matters into her own hands, planning to take both cars (she had arranged to have one towed). One of the officers who responded to the scene of the argument confirmed that the car was registered in Ms. Fleet's name, but Ms. Fleet did not answer when the officer queried whether there was any court order pertaining to the car or inform the officer that Mr. Fleet was supposed to have possession of the car. The officer then instructed Mr. Fleet to remove his belongings from the car so that Ms. Fleet could drive it away. Instead, she left the car and went to court to file a CPO petition.

entered the parked car, took his child from the car, walked to his office with her in the car seat and returned the child to the mother — took *less than three minutes*. Mr. Fleet did so after he had asked that a police officer be summoned. There was no deception, no surreptitious or violent behavior, no sustained or substantial withholding of the child from Ms. Fleet, and no refusal or resistance when Mr. Fleet was requested to return the child.

Notwithstanding that it was Ms. Fleet who provoked the confrontation over the car, the minimal amount of time and distance involved in moving the child from the car to the office, and Mr. Fleet's testimony that he acted out of concern for his daughter's welfare, the majority concludes that the evidence suffices to support the trial court's finding that there was good cause to believe Mr. Fleet was guilty of parental kidnapping. In my view this conclusion is based on a too-literal interpretation of the parental kidnapping statute and on inferences about Mr. Fleet's intent that the evidence does not reasonably support. I also conclude that the entry of a CPO against Mr. Fleet is unwarranted not only because of this unsupported finding but also because of the history of Mr. Fleet's past compliance with visitation orders. The outcome in this case unfairly tars Mr. Fleet as likely to have committed a criminal misdemeanor. D.C. Code § 16-1024 (a) (2012 Repl.). Beyond the unfairness in this particular case, a determination that the parental

kidnapping statute is violated on facts as trivial as these, I fear, has the potential to cause much mischief in the future by adding another arrow to the quiver of feuding spouses in the unfortunate fight for advantage in divorce and custody actions. For these reasons, I dissent.

## I.  Parental Kidnapping

The provision of the parental kidnapping statute on which the majority relies has four principal elements — one defines the status of the person; two concern the person's mental state, with separate knowledge and intent requirements; and one lists the prohibited acts (actus reus):

(1) the person must be a "relative" (defined to include a parent, D.C. Code § 16-1021 (4) (2012 Repl.)) or a person acting pursuant to the relative's direction,

(2) the person must know that "another person is the lawful custodian of a child,"

(3) the person must "abduct, take or carry away a child," and

(4) the person must do so "with the intent to prevent a lawful custodian from exercising the right to custody of the child." [3]

---

[3] D.C. Code § 16-1022 (b)(1) provides:

(continued . . .)

The first two elements are not in dispute.[4] The majority concludes that by taking his daughter out of the car and carrying her to his office, Mr. Fleet's actions satisfied the actus reus element of "abduct[ing], tak[ing], or carry[ing] away" the child. That literal interpretation of the statute is not reasonable for a parental kidnapping statute, especially when applied to very young children. In this case, for example, we are dealing with a fourteen-month-old infant who, of necessity, always must be "taken" or "carried" when a parent has any physical contact to move her. Under the majority's literal interpretation, a parent runs the risk of engaging in the actus reus proscribed by the parental kidnapping statute by, for example, transferring a child in a car seat from a window exposed to too much sun

---

(. . . continued)

> No relative, or any person acting pursuant to directions from the relative, who knows that another person is the lawful custodian of a child may:
>
> (1) Abduct, take, or carry away a child with the intent to prevent a lawful custodian from exercising rights to custody of the child.

[4] Mr. Fleet is the child's father and he was aware of the court-ordered schedule that gave custody to Ms. Fleet at the time of the confrontation in the parking lot; his right to visitation was later in the day.

to a shaded one or changing her diaper. Or, in the case of older children, a parent

who drives a child to school, or takes the child on a bus to the park.[5]

The majority rejects any consideration of the short duration or distance

involved in this case — the less than three minutes it took for Mr. Fleet to take his

---

[5] The majority avoids addressing the trial court's finding that Mr. Fleet also violated another subsection of the statute, D.C. Code § 16-1022 (a), by "concealing" the child because she was not in her mother's line of sight when Mr. Fleet took her into his office. Two obstacles to a visual connection were cited: a van that had parked in front of THEARC temporarily blocked Ms. Fleet's view as Mr. Fleet walked to the building, and that Ms. Fleet could not look into Mr. Fleet's office from where she was standing in the parking lot. A video from a security camera introduced into evidence shows, however, that Mr. Fleet walked for only a few seconds behind the van on his way into the building and that THEARC is housed in a glass-fronted building. Several persons, some with children, are seen entering and exiting the building. The testimony is that Mr. Fleet's office is at the front of the building, overlooking the parking lot where Ms. Fleet was standing; there is no reason to doubt that Ms. Fleet knew where Mr. Fleet's office was located and that she could have walked into the building. In other words, the same literal interpretation of the "taking" and "carrying away" provision of the parental kidnapping statute pervades the trial court's interpretation of the "concealment" provision. It is a strained interpretation that does not comport with common-sense understanding of what it means to "conceal" in the context of kidnapping. *See People v. Manning*, 778 N.E. 2d 1222, 1226 (Ill. Ct. App. 2002) (applying common understanding to undefined statutory term "conceal" as meaning to "hide or keep from observation, discovery, or understanding; keep secret," and concluding evidence sufficient to find concealment where the jury reasonably could have inferred that defendant intended to hide child and keep her from her mother's observation where child was taken out of state and country surreptitiously and mother was not notified of whereabouts for nineteen days); *State v. Fitman*, 811 N.W.2d 120, 123 (Minn. Ct. App. 2012) ("Concealing children requires actively hiding them or attempting to keep another from discovering their whereabouts.").

daughter from the car parked in front of THEARC, cross the driveway to his office at the front of the building, and return the child at Ms. Fleet's request. Citing *Richardson v. United States,* 116 A.3d 434, 438-39 (D.C. 2015), the majority concludes there is no durational or distance requirement in the parental kidnapping statute. I see two problems with that reasoning. *Richardson* involves the general criminal kidnapping statute, which employs different language and, by its terms, specifically does not apply to parents and children. *Compare* D.C. Code 22-2001[6] *with* D.C. Code § 16-1022 (b)(1), *supra* note 3. Moreover, in a recent opinion, this court, while acknowledging the holding in *Richardson* as binding authority under *M.A.P v. Ryan*, 285 A.2d 310, 312 (D.C. 1971), pointed to scholarly warnings against such broad interpretations of kidnapping statutes, noting the trend in other jurisdictions toward more narrow constructions and the Model Penal Code's definition requiring a "substantial" distance or time. *See Spencer v. United States*, No. 13-CF-0085, 2016 WL 852506, at *6-*8 & n. 10 (D.C. Mar. 3, 2016). In this

---

[6] The general criminal kidnapping statute provides:

> Whoever shall be guilty of, or of aiding or abetting in, seizing, confining, inveigling, enticing, decoying, kidnapping, abducting, concealing, or carrying away any individual by any means whatsoever, and holding or detaining, or with the intent to hold or detain, such individual for ransom or reward or otherwise, *except, in the case of a minor, by a parent thereof,* shall, upon conviction thereof, be punished by imprisonment for not more than 30 years.

D.C. Code § 22–2001 (2001) (emphasis added).

case, unlike in *Spencer*, *M.A.P.* does not compel us to adopt *Richardson'*s dubious interpretation for the parental kidnapping statute.

The majority also cites another subsection of the parental kidnapping statute as support for its conclusion that any physical movement of a child regardless of duration or distance satisfies the statute's requirement of "taking or carrying away." This subsection requires, in addition to the same intent required by subsection (b)(1) of an intent to prevent the lawful custodian's rights, a forty-eight-hour holdover after a reasonable demand for the return of the child in the specific situation where the child is being withheld by a person who "obtained actual physical control of the child for a limited time" in the exercise of visitation rights pursuant to court order. D.C. Code § 16-1022 (b)(3).[7] From this explicit forty-eight-hour requirement in subsection (b)(3) the majority concludes that there is no durational element for the offense under subsection (b)(1). This is a non sequitur for even if there is no specified minimum duration or distance *required* under subsection (b)(1), that does not mean that the trivial time lapse and short distance involved in this case are irrelevant on the question whether there has been a

---

[7] This is the subsection that would apply to Mr. Fleet's same actions if, instead of trying to take the car in the morning when she had custody of the child, Ms. Fleet had attempted to take the car later in the day, when Mr. Fleet had visitation hours.

parental kidnapping. This is particularly so with respect to the statutory requirement that Mr. Fleet's actions have been taken with "the intent to prevent" Ms. Fleet from exercising her right to physical custody of the child at that time.

The short time and distance involved in this case, along with the circumstances as a whole, say a lot about Mr. Fleet's intent when he briefly moved the child to his office in response to Ms. Fleet's untoward action and angry outburst. At most, Ms. Fleet's custodial rights were slightly infringed and only in the sense that she did not exercise exclusive physical control during the few minutes that Mr. Fleet removed the child from the altercation. Ms. Fleet's right to custody was not questioned nor was she prevented from asserting it. To the contrary, as soon as she asked, the child was returned to her. The majority cites no authority supporting a finding of parental kidnapping in similar circumstances. *Cf. Tarver v. City of Edna,* 410 F.3d 745, 751 (5th Cir. 2005) (in case challenging detention as violative of Fourth Amendment, officers could reasonably believe that grandfather of child was committing an offense as they thought mother had custody and grandfather "was indisputably involved in hindering the officers' attempts to return [the child] to [the mother.]"); *Johnson v. Johnson*, 206 S.W. 2d 400, 403 (Tenn. 1947) (holding Tennessee child abduction statute's prohibition on "unlawful[ly] taking or decoy[ing] away" a child "with intent to detain or conceal

such child from its parents, guardian or other person having lawful charge of such child" is violated by proof of "forcible or surreptitious" removal of child by parent with knowledge of other's custody) (citing *Hicks v. State*, 12 S.W. 2d 385 (Tenn. 1928)); *State v. O'Dell*, 924 A.2d 87, 89-91 (Vt. 2007) (holding that non-custodial mother's two-hour refusal to surrender child violated statute prohibiting "taking, enticing or keeping a child from the child's lawful custodian, knowingly, without a legal right to do so.").

The majority affirms the trial court's finding that Mr. Fleet acted with the intent to prevent Ms. Fleet from exercising her right to physical custody of their child. The trial court recognized Mr. Fleet's testimony that he had acted out of concern for the welfare of the child, to remove her from harm's way because Ms. Fleet was "'spewing expletives,' 'agitated', 'out of control,' and 'acting crazy.'" As the trial court noted, Mr. Fleet's testimony about Ms. Fleet's behavior was corroborated by other witnesses, a video,[8] and Ms. Fleet herself. The trial court found Mr. Fleet to be a credible witness and did not question Mr. Fleet's testimony

---

[8] A second video introduced into evidence was taken from inside the car Ms. Fleet was trying to abscond with. Mr. Fleet was sitting in the car to prevent Ms. Fleet from taking it. The video shows a very angry Ms. Fleet, standing outside the car, yelling at the top of her voice: "Get out of the car, Edmund, and stop being a fucking child." At the time, their daughter was in the back seat where Ms. Fleet had placed her.

that he acted out of concern for his daughter and wanted to protect her.[9]  Rather, the trial court found that he "*also* had the specific intent to prevent Ms. Fleet, who had lawful physical custody of her daughter at that time, from exercising her rights to physical custody at that time."  (emphasis added).

It is important to bear in mind that merely the fact that Mr. Fleet knew it was Ms. Fleet's assigned time with the baby is not enough, without more, to prove that he acted with the purpose of preventing Ms. Fleet's exercise of custodial rights. That is clear from the face of the parental kidnapping statute which requires, as two separate elements, both "knowledge" that another is the lawful custodian of the child and the specific "intent to prevent" that custodian's exercise of the right to custody.

---

[9]  The trial court commented that there was no evidence that the child was "in danger of imminent physical harm  … or was suffering from any emotional harm."  "Imminent physical harm" is the standard for asserting a *defense* to parental kidnapping, D.C Code 16-1023 (a)(1), and is largely irrelevant to whether Mr. Fleet had the intent to prevent Ms. Fleet's custody, which is the statutory element that must be proven before a finding of parental kidnapping can be made. Only after that finding has been made does the defense come into play. On the issue of intent, whether there was evidence of an actual risk of physical or emotional harm to the child does not determine whether Mr. Fleet genuinely had that concern.  The court itself expressed a similar concern when it found, in granting the CPO, that the altercation over Ms. Fleet's attempt to take the car created a "volatile situation" and that a past "pattern of allegations and discord" meant "their discord could eventually threaten their safety or their daughter's."

Intent is rarely self-evident and the trial court is allowed to make reasonable inferences about a person's intent from the person's actions. To be reasonable, inferences must be based on the evidence and take into account the circumstances as a whole; otherwise, an inference is impermissibly speculative. The circumstances in this case do not reasonably permit an inference that Mr. Fleet acted with the intent (i.e., for the purpose) of preventing Ms. Fleet's right to custody. Here, the tense confrontation between the Fleets over the car took place outdoors, in a parking lot, on a day in early March that Ms. Fleet described as "cold." It was Ms. Fleet who chose to put the child on the back seat of the car she was surreptitiously trying to take, and Mr. Fleet was justified in trying to prevent her from doing so and waiting for a police officer to intervene. He also was justified, as a father, in trying to protect his child from the tense situation. Faced with these circumstances, Mr. Fleet made the choice to take the child to his office directly across the street, where she could be safe inside. Is it reasonable to infer that because he did not instead leave the child in the car, or place her outside on the parking lot or the sidewalk, he acted with the intent to prevent Ms. Fleet's custody?

In support of the finding that Mr. Fleet had the requisite intent to prevent Ms. Fleet's custody, the majority cites with approval the trial court's observation that by his actions Mr. Fleet "entirely remov[ed] the child from Ms. Fleet's

presence" and "removed the child not just out of earshot from Ms. Fleet, but he also removed the child from her ability to even see her child or leave with her child if she so chose to leave." The reasonableness of an inference of intent to prevent custody drawn from these facts is questionable because custodial rights are not defeated merely because a child is not continually in the custodial parent's presence, earshot, or field of vision, as happens regularly when a child is in daycare, on a playdate, or at school. Moreover, the evidence does not support the asserted factual premise that the child was "entirely removed" from Ms. Fleet's presence or view as she was well aware — as were the police officers and others standing by — of where Mr. Fleet took the child. Ms. Fleet could simply have followed them into the building if she had wanted to do so. Nor does the record support that Ms. Fleet was prevented from leaving with her child. What the record supports is the opposite for, according to Officer Garner's testimony, as soon as Ms. Fleet asserted her right to custody by asking the police officer for the child, Mr. Fleet immediately and without any resistance handed her over. Ms. Fleet then left with the child.

The majority's conclusion that the evidence supports that Mr. Fleet acted with the intent to prevent Ms. Fleet's right to custody is puzzling because it is

undercut by findings of the trial court that are cited with approval by the majority. According to the majority:

> (1) the parental kidnapping at issue in this case was troubling, because such kidnappings can quickly escalate into violence; (2) Mr. Fleet himself recognized that the incident on March 10, 2014, created a "volatile situation"; (3) the present CPO petitions were part of a series of allegations that demonstrated the contentious relationship between the parties; and (4) previous CPO petitions, although voluntarily withdrawn, included serious allegations of assault, threats, and destruction of property. Taken together, the trial court explained, these considerations supported a conclusion that the parties' interactions could eventually threaten their safety and that of the child, and that a CPO was warranted to "ensure peace and safety."

*Ante* at 14.

These facts do not support that Mr. Fleet had the intent to prevent Ms. Fleet's custody. To the contrary, they support Mr. Fleet's testimony that his intent was to protect his daughter by removing her from the altercation, which he recognized as a "volatile situation" in light of the Fleets' continuing disagreements and accusation. By taking her to his nearby office, and doing so in the presence of Ms. Fleet and police officers he had called for, Mr. Fleet acted in response to a situation initiated by Ms. Fleet in a manner he deemed commensurate to the exigencies of the situation. The issue of intent for parental kidnapping is not whether a parent's actions were wise or the only available course, but whether they

were motivated by a desire to prevent the lawful custodian's exercise of custody. It is an undisputed fact of this case that when Ms. Fleet asked for the child less than three minutes after Mr. Fleet removed her from the car, he immediately gave the child back to her. By his prompt compliance, Mr. Fleet recognized that Ms. Fleet had custody at the time and respected her assertion of custodial rights.

According to the majority, its disagreement with my dissent is "primarily factual." Appellate court review, however, is not fact-finding. The interpretation of a statute is a question of law. *See District of Columbia Office of Tax & Revenue v. BAE Sys. Enter. Sys., Inc.*, 56 A.3d 477, 480 (D.C. 2012). As explained above, in my opinion the majority's literal interpretation of the parental kidnapping statute is legally incorrect. Appellate review for sufficiency of the evidence is also a question of law. *See Roy v. United States*, 652 A.2d 1098, 1103 (D.C. 1995). I conclude, as a matter of law, that the evidence in this case does not suffice to support a finding by a preponderance of the evidence that Mr. Fleet engaged in a parental kidnapping of his child.

## II. Civil Protection Order[10]

The conclusion I reach in the preceding section would remove a determination that is a necessary precondition to the granting of a CPO. *See* D.C. Code § 16-1005 (c) (2015 Supp.) (requiring "good cause to believe" that an Intrafamily Offense, such as parental kidnapping, has been committed). The entry of a CPO against Mr. Fleet is also unwarranted when the evidence is considered in its totality. We have repeatedly emphasized the importance that the court take into account the "entire mosaic" of the parties' relationship in deciding whether to impose a CPO. *Cruz-Foster v. Cruz-Foster*, 597 A.2d 927, 930 (D.C. 1991). In this case, the court commented generally that the parties "have had a turbulent relationship that has often teetered on the edge of violence," referring to "allegations" in the record in this case and prior CPO petitions filed by the parties against each other. Those CPO petitions had been voluntarily withdrawn, however, and no determinations had been made. The court in this case did not

---

[10] In this case, each party had petitioned the court for a CPO against the other. The trial court granted Ms. Fleet's petition and denied Mr. Fleet's. As the majority opinion relates, the trial court rejected the legal theory upon which Mr. Fleet's petition was filed (theft of the car) and, on appeal, Mr. Fleet has abandoned that theory and presented a new one (unlawful entry of the car). On this record, I agree with the majority's conclusion that the trial court did not commit plain error in denying entry of a CPO against Ms. Fleet. I therefore join Part IV of the majority opinion. I dissent, however, from the majority's affirmance of the entry of a CPO against Mr. Fleet.

purport to review the allegations made in those prior petitions to determine which party was at fault by making an assessment of credibility or the likelihood that there was any support for the allegations. Instead, the court commented on the nature of the "troubling" crime of parental kidnapping generally as one that could "escalate to a violent situation quickly as emotions easily would be expected to run high in matters involving children being taken away from a parent." The court also made reference to a study funded by the U.S. Department of Justice which mentioned that "fathers were much more likely to use force to abduct their children or to retain them by not returning them from a visitation, whereas mothers rarely used force to abduct their children." These observations may be true as general propositions, but they have nothing to do with this case where there was no violence from Mr. Fleet or history of abusing visitation rights.

Indeed, when the court focused on the facts of this case, it expressly found to the contrary in granting visitation rights to Mr. Fleet in spite of the entry of a CPO:

> [Mr. Fleet] has handled visitation on numerous occasions in the past. There has never been a safety concern during the visitation. Even during the incident that was the subject matter of the [CPO] trial, there was no evidence that the minor child's safety was ever compromised. Accordingly, the court granted visitation, finding that the respondent's visitation with the minor child would not endanger [Ms. Fleet] or the child.

Mr. Fleet's past actions, acknowledged by the court, should have weighed against the entry of a CPO for "a defendant's past conduct is important evidence — perhaps the most important — in predicting his probable future conduct." *Cruz-Foster*, 597 A.2d at 930. Subsequently, after this court remanded the case for more explicit findings, the court added that Mr. Fleet recognized that the morning's altercation in the parking lot over the car was a "volatile situation" as evidenced by the fact that he had sent his parent to collect the child in the afternoon at the appointed hour. But what Mr. Fleet's actions show – both during the morning incident in the parking lot and in the arrangement he made for the afternoon's transfer of custody – is his ability to recognize and act to defuse a volatile situation. These actions also form part of the entire mosaic that must be taken into account. Instead of getting credit for his past behavior during visitations and his demonstrated ability to act to prevent an escalation of tensions, however, he was slapped with a CPO.

The trial court was clearly motivated by the desire to enter an order that would, as the court expressed, "ensure peace and safety by reducing or prohibiting interactions between the parties" in light of the "pattern of allegations and discord . . . [which] supports the conclusion that the parties were unlikely to have positive

interactions with each other and this discord could eventually threaten their safety or their daughter's."   That is a laudable goal and one difficult to achieve when the trial court is put in the unenviable role of refereeing between feuding parents, but it may not be accomplished by imposing a CPO without necessary and well-supported findings grounded in the facts of the case.   Where two parties are bickering it is unfair to lay the onus of a CPO on one simply for the sake of ensuring the peace of both in the future.  A CPO can have legal consequences for a parent, *see* D.C. Code § 16-914 (a)(3)(F) ("In determining the care and custody of a child, the best interest of the child shall be the primary consideration.   To determine the best interest of the child, the court shall consider all relevant factors, including, but not limited to . . . evidence of an intrafamily offense."); *Wilkins v. Ferguson*, 928 A.2d 655, 669 (D.C. 2007), and merely the fact of its entry could affect the parent's standing and relationship with the child and others in the family. A CPO is, without a doubt, an important tool that should be used in the full exercise of the court's discretion to achieve the purposes of the statute, but it must be wielded with care.   In this case, I conclude that its use was legally unsubstantiated and unjustified.